AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Missouri

**FILED**

SEP **2 5** 2013

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

In the Matter of the Search of
15713 Sean Michael Square, Chesterfield, Missouri 63017 is described as a
single family residence comprised mainly of brick.  There is a two car garage
on the front left of the residence with a tan colored overhead garage door.
The entry way is surrounded by brick with a brown front door with six
windows near the top of the door.  The black numerals 15713 are affixed to
the right side of a window located between the overhead garage and the front
door.

)
)
)
)
)
)
)

Case No.      4:13MJ7272    (SPM)

## APPLICATION FOR A SEARCH WARRANT

I,  BRANDON MOLES                      , a federal law enforcement officer or an attorney for the government
request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:
15713 Sean Michael Square, Chesterfield, Missouri 63017 is described as a single family residence comprised mainly of brick.  There is a two car garage on the
front left of the residence with a tan colored overhead garage door.  The entry way is surrounded by brick with a brown front door with six windows near the
top of the door. The black numerals are affixed to the right side of a window located between the overhead garage and the front door,

located in the _____ EASTERN _____ District of _____ MISSOURI _____ , there is now concealed

### SEE ATTACHED LIST

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. Sections 846 & 841(a)(1) | Conspiracy to distribute and possess with the intent to distribute controlled substances |

The application is based on these facts:

### SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

BRANDON MOLES, Special Agent - DEA

*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 09/25/2013

*Judge's signature*

City and state:  St. Louis, MO

Honorable Shirley Padmore Mensah, U.S. Magistrate Judge

*Printed name and title*

AUSA:  JOHN T DAVIS

## I. INTRODUCTION

1. I, Brandon Moles, a Special Agent with the United States Drug Enforcement Administration (hereinafter, "the DEA"), being duly sworn, depose and state: I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I have been employed by the DEA as a Special Agent for approximately eight years. Prior to being employed by the DEA, I was a Border Patrol Agent with the United States Border Patrol for approximately one year. During my time as a law enforcement officer, I have participated in several complex investigations with drug trafficking organizations dealing in cocaine, heroin, MDMA or ecstasy, marijuana or other controlled substances. I have also conducted surveillance; reviewed taped drug conversations and drug records; participated in undercover transactions; used court-authorized wiretaps and pen registers; served search and arrest warrants, and debriefed informants. Through my training, education and experience, I am familiar with the manner in which illegal drugs and bulk U.S. currency are transported.

2. I am part of an investigative team, consisting of experienced narcotic investigators and we are currently involved in an ongoing investigation targeting members of a marijuana distribution organization. This investigation currently centers on the criminal activity of **Kyle KIENSTRA**, **Miles AMANN**, **Scott HENSLER**, **Michael SARACINO** and additional members involved in the distribution of marijuana in St. Louis, Missouri, Chicago, Illinois and the Boston, Massachusetts, area. As a result of my personal participation in this investigation, conversations with other investigators, confidential source information and analysis of law enforcement reports, I am familiar with all aspects of this investigation.

3. The investigation centers on a marijuana distribution conspiracy which is being primarily conducted by DEA Special Agents and Task Force Officers. This investigation primarily centers on the above mentioned target subjects and other co-conspirators not yet identified, hereinafter referred to as members of the organization for offenses enumerated in Title 18, United States Code, Section 2516, that is (a) offenses involving the importation, distribution and possession with the intent to distribute controlled substances, the use of wire facilities to facilitate the same, conspiracy to do the same, and attempts to do the same, in violation of Title 21, United States Code, Sections 841, 843(b), 846 and 848(b) the laundering of the proceeds

derived from the distribution of illegal narcotics, in violation of Title 18, United States Code, Sections 1956 and 1957, and offenses enumerated in Title 18, United States code, Section 924(c), possession of firearms in furtherance of drug trafficking.

4. This affidavit is in support an application for an Order requesting the authorization for a Federal search warrant for the residence located at 15713 Sean Michael Square, Chesterfield, Missouri 63017.

**Target Residence – 15713 Sean Michael Square, Chesterfield, Missouri 63017** is the residence of **Kyle KIENSTRA**, **Miles AMANN** and **Scott HENSLER**. **Target Residence** is a single family residence comprised mainly of brick. There is a two car garage on the front left of the residence with a tan colored overhead garage door. The entry way is surrounded by brick with a brown front door with six windows near the top of the door. The black numerals 15713 are affixed to the right side of a window located between the overhead garage door and the front door of the residence.

The electric utilities are in the name of **Michael SARACINO** and have been registered to **SARACINO** since January 02, 2013.1 Information related to **SARACINO** is provided below in this affidavit.

## II. OVERVIEW OF THE INVESTIGATION

5. In January 2012, investigators from the DEA St. Louis Division conducted an initial debriefing of a Confidential Source (hereinafter referred to as **CS #1**) regarding subjects involved in the transportation and subsequent distribution of multi hundred pounds of high end marijuana from California to St. Louis, Missouri and the Boston, Massachusetts, area. **CS #1** is characterized as a defendant confidential source and **CS #1** cooperated with investigators to seek judicial leniency pursuant to his/her previous arrest. **CS #1** was deemed reliable based on telephone toll analysis, surveillance, commercial airline records and information provided by additional confidential sources. The information provided by **CS #1** resulted in the initiation of this investigation targeting the **Thomas ANDERSON** and **Kyle KIENSTRA** marijuana trafficking organization.

6. Investigators frequently met with **CS #1** during this investigation until he/she was sentenced to the custody of the Bureau of Prisons in approximately January 2013. In summary, **CS #1** stated ANDERSON has been coordinating the shipment of multi hundred pounds of high end marijuana from California to St. Louis since 2005 and **KIENSTRA** has been involved in the

---

1 As related in Paragraph 69, although utilities for the target residence are in Saracino's name, Saracino is not known to reside at the target residence but maintains a residence at 3543 Lost Meadow Court, St. Louis, Missouri.

distribution of marijuana since 2010. **CS #1** stated in 2010, **KIENSTRA** and ANDERSON were closely associated and obtained hundred pound quantities of marijuana in California for distribution in St. Louis. **CS #1** stated **KIENSTRA** and ANDERSON subsequently began coordinating the shipment of hundred pound quantities of marijuana to Boston, Massachusetts. **CS #1** stated in approximately December 2011 or January 2012, ANDERSON stole approximately $200,000 from **KIENSTRA** which resulted in the division between **KIENSTRA** and ANDERSON. **CS #3**, **CS #4** and **CS #5** have also verified that **KIENSTRA** and ANDERSON separated based on ANDERSON stealing a large sum of U.S. currency from **KIENSTRA**.

7. During the initial investigation, investigators were unaware that **KIENSTRA** and ANDERSON separated and investigators focused the investigation on **ANDERSON** and his associates. The investigation of ANDERSON and his associates led to the authorization of three Title III investigations, two federal search warrants and the seizure of approximately $100,000 and five (5) firearms. As a result of the investigation targeting ANDERSON, investigators were able to garner the cooperation of several additional confidential sources (hereinafter referred to as **CS #3**, **CS #4** and **CS #5**) who have been involved in the distribution of marijuana with ANDERSON and **KIENSTRA**. The confidential sources are all characterized as defendant confidential sources and are currently cooperating with law enforcement to seek judicial leniency regarding their criminal roles in this investigation. **CS #3**, **CS #4** and **CS #5** have been deemed reliable based on information and assistance which they have provided investigators.

8. Based on information from **CS #1**, **CS #3**, **CS #4** and **CS #5**, **ANDERSON** and **KIENSTRA** have had several marijuana sources of supply over the past few years and ANDERSON and **KIENSTRA** have utilized several methods to transport marijuana and/or bulk U.S. currency to include; passenger vehicles; recreational vehicles; private aircraft; tractor trailers; freight shipping companies and the United States Postal Service.

9. Based on the culmination of information provided by **CS #3**, **CS #4** and **CS #5**, investigators began to focus the investigation on **KIENSTRA** and his associates. As described below in this affidavit, based on confidential source information, surveillance and the seizure of marijuana and U.S. currency, your affiant believes the authorization of a search warrant for **target residence**, occupied by **KIENSTRA**, **AMANN** and **HENSLER** will result in securing evidence to assist in the prosecution of the target subjects and dismantle a marijuana distribution

organization responsible for the transportation and distribution of hundred pound quantities of marijuana.

## III. CONFIDENTIAL SOURCE INFORMATION

### A. Information Provided by CS #1

10. As referenced above, on January 24, 2012, investigators conducted an initial debriefing of **CS #1** in St. Louis, Missouri. Information provided by **CS #1** led to the initiation of this investigation and **CS #1** identified **KIENSTRA** and **AMANN** as being involved in the distribution of marijuana. On September 12, 2012, investigators interviewed **CS #1** in St. Louis, Missouri. **CS #1** stated he/she was recently in contact with **AMANN** and **CS #1** stated that **AMANN** advised he was distributing most of his marijuana in Chicago, Illinois. **CS #1** stated that **AMANN** advised he could make more money by selling the marijuana in Chicago. **CS #1** stated **AMANN** recently sent two hundred (200) pounds of marijuana to Chicago. **CS #1** was unable to provide any names of individuals distributing marijuana for **AMANN** in Chicago.

### B. Interview of CS #3 on December 14, 2012

11. On December 14, 2012, investigators interviewed **CS #3** in St. Louis, Missouri. **CS #3** stated in approximately January 2010, he/she began to obtain pound quantities of marijuana from ANDERSON. **CS #3** stated ANDERSON obtained shipments of sixty (60) to one hundred twenty (120) pounds of marijuana approximately every four to six weeks. **CS #3** stated the marijuana was initially being transported from Redding, California to St. Louis via tractor-trailer then ANDERSON met a pilot identified as Lee PERKINS. **CS #3** stated he/she believed PERKINS transported a total of approximately six to eight shipments of marijuana to St. Louis via private aircraft. **CS #3** stated he/she believed the last shipment of marijuana PERKINS transported occurred in approximately October or November 2011.

12. **CS #3** stated during this time, ANDERSON paid Brian HOUNSOM and **KIENSTRA** to transport marijuana proceeds to California via commercial airlines. **CS #3** stated HOUNSOM and **KIENSTRA** transported $150,000 to $175,000 per trip. **CS #3** stated **KIENSTRA** was initially transporting U.S. currency and obtaining multi pounds of marijuana at a time from ANDERSON. **CS #3** stated ANDERSON and **KIENSTRA** began orchestrating the shipment of marijuana to the Boston and New York area. **CS #3** stated in approximately August or September 2011, ANDERSON and **KIENSTRA** had a dispute over money. **CS #3**

stated ANDERSON and **KIENSTRA** subsequently separated and **KIENSTRA** has since obtained a new marijuana source of supply in the San Francisco, California, area.

**CS #3** stated "**Scotty**" and "**Miles**" were involved in the distribution of marijuana with **KIENSTRA**. Investigators previously identified "**Scotty**" as **Scott HENSLER** and "**Miles**" as **Miles AMANN**.

### C. Interview of CS #4 on February 01, 2013

13. On February 01, 2013, investigators interviewed **CS #4** in St. Louis, Missouri. **CS #4** confirmed that Lee PERKINS transported marijuana to ANDERSON via private aircraft. **CS #4** stated between approximately August and October 2011, **CS #4** resided with **KIENSTRA** in Hollywood, California, **CS #4** stated he/she and **KIENSTRA** obtained marijuana from a Hispanic male in Bakersfield, California. **CS #4** stated from approximately June through October 2011, he/she and **KIENSTRA** obtained approximately five to six shipments, each consisting of approximately sixty (60) to ninety (90) pounds of marijuana which was subsequently transported to St. Louis for distribution. **CS #4** stated on November 26, 2011, "Gio" attempted to transport one-hundred (100) pounds of marijuana via tractor-trailer from California to St. Louis for **CS #4** and **KIENSTRA**. **CS #4** stated "Gio" was stopped near Amarillo, Texas, by the Texas Department of Public Safety and the marijuana was subsequently seized.

14. **CS #4** stated in approximately January 2012, **KIENSTRA** or **AMANN** was introduced to Ryan FAIRBROTHER who resides in the San Francisco, area. **CS #4** stated FAIRBROTHER was a marijuana broker and FAIRBROTHER introduced **CS #4**, **KIENSTRA** and **AMANN** to a white male known only as "Mike" to obtain bulk marijuana. **CS #4** stated Mike is also a pilot. **CS #4** stated during the first marijuana transaction, **CS #4**, **KIENSTRA**, **AMANN** and **KIENSTRA's** uncle subsequently identified as Skip OLSON met with FAIRBROTHER and Mike in the San Francisco, area. **CS #4** stated he/she, **KIENSTRA**, **AMANN** and **OLSON** paid approximately $30,000 to $40,000 and utilized a vehicle as collateral to obtain approximately forty (40) to sixty (60) pounds of marijuana. **CS #4** stated the marijuana was shipped from Oakland to St. Louis via ABF Freight. **CS #4** stated he/she believed FAIRBROTHER utilized his information to ship the container and **HENSLER** and **KIENSTRA** picked up the marijuana from the ABF Freight terminal in St. Louis. SA Moles obtained ABF Freight records which revealed on December 8, 2011, FAIRBROTHER ordered a U-Pack

ReloCube to be shipped from Mill Valley, California to St. Louis. The records revealed the shipment was paid with a series of money orders totaling \$2,193, on December 13, 2013.

15. **CS #4** stated after the first transaction, he/she and **KIENSTRA** had a disagreement over money and **KIENSTRA** "cut out" **CS #4** and continued to deal directly with FAIRBROTHER and Mike. **CS #4** stated he/she believes Mike transported marijuana and bulk U.S. currency via private aircraft for **KIENSTRA** and his associates.

### D. Interview of CS #4 on February 12, 2013

16. On February 12, 2013, investigators interviewed **CS #4** in St. Louis, Missouri. **CS #4** stated he/she and **KIENSTRA** stopped talking to one another in approximately January 2012. **CS #4** stated approximately two to three months later, **CS #4** met with **Michael SARACINO** in St. Louis. **CS #4** stated **SARACINO** advised **CS #4** that **KIENSTRA** was bringing in shipments of marijuana to St. Louis and **SARACINO** obtained approximately twenty (20) pounds of marijuana at a time from **KIENSTRA**. **CS #4** stated **SARACINO** showed **CS #4** the quality of the marijuana. **CS #4** stated **SARACINO** has stored marijuana and U.S. currency for **KIENSTRA** and **SARACINO** talked about getting a "stash" house for **KIENSTRA**. As noted above, the electric utilities for **target residence** are registered to **SARACINO**.

### E. Interview of CS #5 on March 14, 2013

17. On March 14, 2013, investigators interviewed **CS #5** in St. Louis, Missouri. **CS #5** stated he/she has been purchasing marijuana from **KIENSTRA** for approximately one year. **CS #5** stated he/she typically obtained ten (10) to twenty (20) pounds of marijuana from **KIENSTRA** every six to eight weeks. **CS #5** stated he/she believes **KIENSTRA** obtains marijuana in St. Louis more frequently then every six to eight weeks because **KIENSTRA** has attempted to distribute marijuana to **CS #5** more often, however, **CS #5** declined. **CS #5** stated **KIENSTRA** brings in approximately one hundred fifty (150) pounds of marijuana at a time. **CS #5** stated **KIENSTRA** has previously stated the marijuana is transported from California to St. Louis via tractor trailer and private aircraft. **CS #5** stated **KIENSTRA** and "**Scott**" resided in a condominium complex located on Emerson Road in Creve Coeur for one year and both **KIENSTRA** and **HENSLER** moved out within the past two months. **CS #5** was unable to provide any information where **KIENSTRA** and **HENSLER** were currently residing.

18. **CS #5** stated "**Scott**" usually delivered the marijuana to **CS #5**. SA Moles subsequently displayed a Missouri driver's license photograph of **Scott HENSLER** (DOB: 04-12-1983) to **CS #5**, which he/she identified as the same individual. **CS #5** stated **HENSLER** also picked up marijuana proceeds from him/her in the past. **CS #5** stated **KIENSTRA** never delivered the marijuana but has picked up the marijuana proceeds in the past. **CS #5** stated **Miles AMANN** has previously been arrested with cocaine and is involved in the distribution of marijuana with **KIENSTRA**. **CS #5** also confirmed that **KIENSTRA** and ANDERSON coordinated the shipment of marijuana from California to Boston. **CS #5** stated **ANDERSON** and **KIENSTRA** had a falling out because **ANDERSON** stole over $100,000 from **KIENSTRA**.

19. In addition, **CS #5** stated approximately during the winter of 2011, **KIENSTRA** and Thomas COX began distributing marijuana together. **CS #5** stated **KIENSTRA** and COX shipped quantities of seventy-five (75) to one hundred (100) pounds of marijuana from California to St. Louis via tractor-trailer. **CS #5** stated **KIENSTRA** and COX delivered a shipment approximately every six weeks for a period of five to six months. **CS #5** stated **KIENSTRA** and **COX** had a falling out because COX utilized their drug proceeds to purchase a vehicle.

20. As outlined above, **CS #1, CS #3, CS #4** and **CS #5** have all been deemed reliable and the information provided by the confidential sources has demonstrated that **KIENSTRA** and his associates are involved in the distribution of hundred pound quantities of marijuana.

## IV. IDENTIFICATION OF TARGET RESIDENCE

21. On March 03, 2013, investigators learned that **KIENSTRA** was scheduled to travel from Columbus, Ohio to St. Louis via Southwest Airlines. Investigators established surveillance at the St. Louis Lambert International Airport and subsequently observed **KIENSTRA** exit gate E-10, walk to the parking garage and depart in a Chevrolet Suburban rental vehicle, as investigators followed. Investigators continued to follow **KIENSTRA** as he traveled south on Interstate 170 and proceeded east. Investigators followed **KIENSTRA** to the vicinity of Delmar Avenue and North and South Road and **KIENSTRA** began to "square" the block several times in the area as though he was attempting to identify if he was being followed. TFO Feagans maintained surveillance until **KIENSTRA** accelerated to a high rate of speed in a residential neighborhood. At that time, investigators terminated surveillance for safety reasons

and investigators were unable to identify **KIENSTRA's** residence.

22. Investigators subsequently learned that **KIENSTRA** did not claim his bag from the above mentioned flight and **Anthony BOEHM** arrived at the Southwest Airlines baggage claim area with **KIENSTRA's** baggage claim ticket and was able to take possession of the bag. **CS #1, CS #3** and **CS#4** have stated that **BOEHM** is involved in the distribution of marijuana.

23. The following day, on March 04, 2013, investigators established surveillance of **Anthony BOEHM's** residence located in St. Louis. Investigators followed **BOEHM** from his residence to **target residence**. During the surveillance, TFO Holman observed two vehicles parked in the garage of the residence, identified as a Cadillac Escalade bearing Missouri plate FJ6R1F, registered to Deborah KIENSTRA and a Chevrolet truck bearing Missouri plate 76AC22 registered to Laurie HENSLER. A utilities check through Ameren Missouri revealed as of January 02, 2013, the electric utilities for **target residence** are registered to **Michael SARACINO**. Since the identification of **target residence**, investigators continued to conduct routine spot checks and surveillance of **target residence** and identified that **KIENSTRA, AMANN** and **HENSLER** all reside at the residence.

V.   **SURVEILLANCE OF THE TARGET SUBJECTS**

A. **Surveillance of KIENSTRA at the Drury Plaza Hotel on April 30, 2013**

24. On April 30, 2013, at approximately 10:35 a.m., investigators established surveillance of **target residence**. At approximately 12:05 p.m., TFO Feagans observed **KIENSTRA** and **AMANN** depart from **target residence** in **KIENSTRA's** Cadillac Escalade and travel to the Drury Plaza Hotel located in Chesterfield, Missouri. TFO Jenne observed **AMANN** exit the vehicle and get in his black Chevrolet Suburban which was located in the parking lot, then both **KIENSTRA** and **AMANN** departed the hotel and investigators were unable to maintain surveillance.

25. Investigators subsequently obtained hotel records and electronic video surveillance of the lobby and main entrance to the hotel. The records revealed on April 29, 2013, at approximately 12:54 a.m., **KIENSTRA** arrived at the hotel and paid cash for one room. On April 30, 2013, at approximately 1:02 a.m., **KIENSTRA** was observed exiting the hotel through the main entrance. At approximately 1:09 a.m., an **unknown white male** and **KIENSTRA** entered the lobby through the main entrance and the **unknown male** and **KIENSTRA** were each carrying a bag.

26.  At approximately 1:31 a.m., **KIENSTRA** and a different **unknown male** were observed walking through the lobby and exited the hotel through the main entrance.  At this time, **KIENSTRA** and **the unknown male** were not carrying bags.  In addition, court authorized GPS information for telephone 314-378-9779 (hereafter KIENSTRA telephone) used by **KIENSTRA** revealed **KIENSTRA** was only in the vicinity of the hotel for approximately forty-five minutes. 2   Based on **KIENSTRA** paying cash for a hotel room, surveillance of **KIENSTRA** and the unknown male carrying bags into the hotel and subsequently leaving without the bags, your affiant believes **KIENSTRA** and the **unknown male** delivered marijuana or U.S. currency to an unknown subject.  In addition, PLI information for **KEINSTRA telephone** provided information consistent with **KIENSTRA** returning to **target residence** upon departing the hotel.

### B.  Surveillance of KIENSTRA and AMANN on June 02, 2013

27.  On May 31, 2013, at approximately 4:40 p.m., GPS information for **KEINSTRA telephone** revealed **KIENSTRA** departed St. Louis and traveled by vehicle to Chicago, Illinois. On June 02, 2012, at approximately 2:36 p.m., GPS information for **KEINSTRA telephone** revealed **KIENSTRA** departed Chicago and subsequent GPS information revealed **KIENSTRA** was traveling by vehicle to St. Louis.

28.  At approximately 6:30 p.m., investigators established surveillance in the vicinity of **target residence**, in anticipation of the arrival of **KIENSTRA**.  At approximately 7:28 p.m., SA Baratti observed **KIENSTRA's** black Cadillac Escalade pull into the driveway of **target residence**.  SA Baratti observed the overhead garage door open and **AMANN** exited the driver's seat of the Cadillac Escalade and retrieved a large black duffle bag from the cargo area of the vehicle.  SA Baratti noted that the bag appeared to be heavy as **AMANN** struggled to carry the black duffle bag into the garage of **target residence**.  The black duffle bag was approximately 3 feet in length and approximately one and a half feet in width.  **AMANN** carried the duffle bag by the two loop handles attached in the center of the duffle bag and walked to the front part of the garage where the entrance door to the residence is located.

29.  SA Baratti observed **KIENSTRA** exit the front passenger seat of the vehicle and pull the Cadillac Escalade into the garage of **target residence**.  SA Baratti also observed a black

---

2 On April 12, 2013, the Honorable United States Magistrate Judge Shirley P. Mensah authorized a Precision Location Information warrant for (314) 378-9779 utilized by **KIENSTRA**.  Investigators subsequently received authorization for two extensions of the Precision Location Information warrant. (See also paragraph 65)

Chevrolet Silverado truck parked in the garage of the residence which has previously been identified as being utilized by **HENSLER**. **KIENSTRA** exited the Cadillac Escalade and walked forward into the garage. Shortly thereafter, the overhead garage door closed.

30. At approximately 7:35 p.m., SA Baratti observed the overhead garage door open and **AMANN** exited the garage. The overhead garage door immediately closed once **AMANN** walked out of the garage. **AMANN** entered his Jeep Wrangler and departed the area. Investigators did not attempt to follow **AMANN** and investigators maintained surveillance of **target residence**.

31. At approximately 7:39 p.m., SA Baratti observed the overhead garage door open and **KIENSTRA** walked between the Chevrolet Silverado and Cadillac Escalade and opened the rear cargo door of the Cadillac Escalade. **KIENSTRA** removed the following items from the cargo area of the Escalade: a medium sized red and black duffle bag which had a shoulder strap and a medium sized black luggage bag on wheels. **KIENSTRA** closed the cargo door and walked towards the front portion of the garage carrying the luggage bags. Shortly thereafter, the overhead garage door closed.

32. At approximately 7:43 p.m., SA Baratti observed the overhead garage door open and **KIENSTRA** entered the Cadillac Escalade and departed the area. Investigators lost sight of the Cadillac Escalade near the intersection of Clarkson Road and Baxter Road. At approximately 8:10 p.m., investigators located **KIENSTRA's** black Cadillac Escalade in the parking lot of the Syberg's restaurant located at 17392 Chesterfield Airport Road, Chesterfield, Missouri. Investigators continued to maintain surveillance **target residence** and **KIENSTRA's** Cadillac Escalade at the Syberg's restaurant.

33. At approximately 8:42 p.m., TFO Taschner observed **KIENSTRA** and an unknown black male exit the Syberg's restaurant. TFO Taschner observed **KIENSTRA** enter the driver's seat of the Cadillac Escalade and the unknown black male entered the front passenger seat.

34. At approximately 8:45 p.m., TFO Taschner observed the unknown black male exit the Cadillac Escalade and enter a black sedan bearing Missouri license plate WH0L4U registered to Alma M. Lucas, 7519 Michigan Avenue, St. Louis, Missouri. At that time, the black sedan and the Cadillac Escalade departed the area.

35. Investigators followed **KIENSTRA** as he began to travel towards **target residence**. A/GS Krieg followed **KIENSTRA** as he traveled east bound on Baxter Road. A/GS

Krieg observed **KIENSTRA** execute a left turn into the Westmont Apartment Complex located on Westmeade Drive. A/GS Krieg observed **KIENSTRA** execute a u-turn, then continued traveling east bound on Baxter Road. Based on training and experience, your affiant believes **KIENSTRA** briefly pulled into the apartment complex and then immediately continued traveling on Baxter Road to see if he was being followed by law enforcement. At approximately 8:57 p.m., SA Baratti observed the Cadillac Escalade return to **target residence** and park in the garage.

36. **CS #1** previously stated **AMANN** and **KIENSTRA** distribute marijuana Chicago, Illinois. Based on the surveillance of the target subjects, your affiant believes that the large duffel bag carried by **AMANN** contained bulk U.S. currency derived from the distribution of marijuana in the Chicago, area. In addition, based on GPS information provided by KEINSTRA telephone, utilized by **KIENSTRA**, this was the third trip **KIENSTRA** made to Chicago in a period of approximately six weeks. Investigators have also received confidential source information revealing that **KIENSTRA** has previously concealed bulk U.S. currency in his hockey pads to transport the money. In addition, your affiant believes that based on the brief surveillance of **KIENSTRA** and the unknown black male at the Syberg's restaurant and observing the two subjects briefly enter **KIENSTRA's** vehicle that **KIENSTRA** and the unknown black male were engaging in drug related activity. The subsequent surveillance of **KIENSTRA** conducting a u-turn in the apartment complex as he traveled to **target residence**, supports that he was attempting to identify if he was being followed by investigators.

## VI. LAW ENFORCEMENT EVENTS RELATED TO THE TARGET SUBJECTS

### A. Purchase of a Money Counting Device by Michael SARACINO on February 24, 2013

37. SA Moles received information from a **Source of Information (SOI)** that **SARACINO** purchased a money counting device at the Sam's Club located at 4512 Lemay Ferry Road, St. Louis, Missouri. On May 23, 2013, SA Moles issued an Administrative Subpoena requesting information related to the purchase of a money counting device by **SARACINO**. SA Moles subsequently obtained video surveillance and still photographs of **SARACINO** purchasing a money counting device on February 24, 2013 at the Sam's Club located at 4512 Lemay Ferry Road, St. Louis, Missouri. The receipt revealed **SARACINO** paid $199.98 for the money counting device, along with additional miscellaneous items, with a total bill of $404.25,

which was paid in cash. Your affiant believes **SARACINO** purchased the money counting device to count large sums of U.S. currency derived from the distribution of marijuana.

### B. Seizure of $12,380 from Christopher PYSZKA on March 10, 2013 at the St. Louis Lambert International Airport

38. On March 10, 2013, investigators learned that Christopher PYSZKA and Chrystal DONOVAN were scheduled to depart St. Louis on the evening of March 10, 2013, via American Airlines. Investigators established surveillance at the St. Louis Lambert International Airport. Upon the arrival of PYSZKA and DONOVAN, investigators initiated contact and PYSZKA and DONOVAN agreed to a consensual search of their luggage which resulted in the seizure of U.S. currency from PYSZKA and DONOVAN's luggage as well as PYSZKA's person, totaling $12,380.

39. PYSZKA initially stated his mother, Mitzi PASCH and sister, Erykah PYSZKA, each provided PYSZKA with $5,000 as a loan to purchase a vehicle in Los Angeles. PYSZKA also stated he won $1,500 at the Hollywood Casino while in St. Louis. PYSZKA was then told by investigators that they were aware he was involved in the distribution of marijuana and PYSZKA was then offered the opportunity to cooperate with investigators. At that time, PYSZKA stated he acquired the seized U.S. currency from selling high grade marijuana which he obtained in Ukiah, California, from an unknown Mexican.

40. In addition, PYSZKA stated **Kyle KIENSTRA** and Thomas COX are involved in the distribution of marijuana. PYSZKA stated **KIENSTRA** and COX previously resided in Hollywood Hills, California, and paid $17,000 in rent there each month. PYSZKA stated **KIENSTRA** has an unknown marijuana source of supply in Ukiah, California, and **KIENSTRA** coordinates the distribution of one hundred (100) to two hundred (200) pounds of marijuana from California to St. Louis. PYSZKA stated he had a falling out with **KIENSTRA** over a drug debt. PYSZKA stated that he, along with **KIENSTRA** and COX previously shipped a total of six packages of marijuana to Erykah PYSZKA's residence in the past year.

41. Your affiant believes PYSZKA's initial statement regarding the origin of the seized U.S. currency was inconsistent and vague and that PYSZKA was attempting to minimize his involvement in the distribution of marijuana. However, based on information from the ongoing investigation, PYSZKA's statement regarding the marijuana distribution activity of **KIENSTRA** and COX is accurate. **CS #4** has corroborated that when **KIENSTRA** resided in Hollywood Hills, California, the rent was in fact approximately $17,000 per month. **CS #4** also stated

**KIENSTRA** has mailed marijuana to Erykah PYSZKA's residence. PYSZKA has since retained an attorney and is not currently cooperating with investigators.

### C. Controlled Delivery of marijuana and U.S. currency to Michael SARACINO on March 14, 2013

42. On March 14, 2013, investigators executed a federal search warrant at a residence located in St. Louis, which resulted in the seizure in excess of ten (10) pounds of marijuana and $27,000. Pursuant to the search warrant, **CS #5** began cooperating with investigators. **CS #5** stated approximately eight to ten days prior, **CS #5** arranged to obtain twenty (20) pounds of marijuana from **KIENSTRA**. **CS #5** stated **KIENSTRA** directed an unknown white male (later identified as **Michael SARACINO**) to deliver the twenty (20) pounds of marijuana to **CS #5**. **CS #5** agreed to pay **KIENSTRA** $3,000 per pound and **CS #5** stated the following day, he/she paid **KIENSTRA** $3,000 as partial payment for the marijuana.

43. **CS #5** stated this was the first time the unknown male (**SARACINO**) delivered marijuana to **CS #5**. **CS #5** stated he/she sold ten (10) pounds of the marijuana and accumulated $27,000. **CS #5** stated he/she was having trouble distributing the remainder of the ten (10) pounds of marijuana and advised **KIENSTRA** that he/she was going to return the ten (10) pounds of marijuana in addition to the proceeds from the ten (10) pounds that **CS #5** already sold.

44. On March 15, 2013, SA Moles and SA Krieg obtained approximately one (1) pound of marijuana contained in a vacuum sealed plastic bag and placed the marijuana in a cardboard box which was then sealed by investigators. Investigators utilized two sealed cardboard boxes to simulate that the two boxes contained ten (10) pounds of marijuana and $27,000 for the controlled delivery of the marijuana and U.S. currency to **KIENSTRA**.

45. At approximately 11:30 a.m., investigators established surveillance in the vicinity of a business in St. Louis, Missouri and investigators met **CS #5** at a prearranged location. At approximately 12:09 p.m., **CS #5** sent an electronic text message to **KEINSTRA telephone**, utilized by **KIENSTRA**, as instructed by investigators. The text message stated, "Yo yo. Heading to chi this afternoon. Give me a ring." **CS #5** was referring to Chicago as "Chi."

46. At approximately 12:23 p.m., **CS #5** received a telephone call from telephone number **(214) 557-3240**, utilized by **KIENSTRA**. The telephone call was recorded by investigators and the following is a non-verbatim portion of the conversation between **CS #5** and **KIENSTRA**. **CS #5** asked, "Hey what up bud?" **KIENSTRA** replied, "Ah, not much." **CS #5**

stated, "Hey um, I am gonna probably hop on a train like around 4 or 4:30. I'm hoping to." **KIENSTRA** stated, "Okay." **CS #5** advised, "Um, I got these uh with me and I actually brought that paper too. Can you send someone down here to grab this so I'm not having to like mess around with it this weekend." **KIENSTRA** responded, "Yeah, uh (inaudible). Okay gotcha. Alright. We'll let me call him, I had him, I thought you were home so I had him running, running to your place. Yeah let me call him now." **CS #5** stated, "Yeah. I am at the office." **KIENSTRA** advised, "Alright cool. Let me call him real quick. Yeah I'll (inaudible) on the way right now." **CS #5** stated, "Thanks bud."

47. During the conversation, **CS #5** advised, "I got these uh with me and I actually brought that paper too." **CS #5** was referring to the ten (10) pounds of marijuana as "these" and the U.S. currency ($27,000) as "paper." Your affiant believes when **KIENSTRA** responded, "We'll let me call him, I had him, I thought you were home so I had him running, running to your place", that **KIENSTRA** instructed **SARACINO** to go to **CS #5's** residence to pick up the marijuana and U.S. currency and upon **CS #5** advising **KIENSTRA** that he/she is at the office, **KIENSTRA** was going to contact **SARACINO** to pick up the marijuana and U.S. currency from **CS #5** at his place of employment.

48. At approximately 12:29 p.m., **CS #5** received a telephone call from **KIENSTRA**, as witnessed by SA Moles and SA Krieg. Investigators were unable to record the telephone conversation. **CS #5** stated during the telephone conversation, **KIENSTRA** advised he was sending his buddy and **KIENSTRA** asked **CS #5** if he/she had the "money" and the "chronic", which he/she confirmed.

49. Investigators placed the two cardboard boxes in the trunk of the **CS #5's** vehicle, equipped **CS #5** with an audio recording device and investigators followed **CS #5** from the prearranged location to the business. Investigators maintained constant surveillance of **CS #5's** vehicle, which contained the two cardboard boxes. Upon **CS #5** arriving at the business, TFO Taschner observed **CS #5** exit his/her vehicle and enter the business.

50. At approximately 12:54 p.m., TFO Taschner observed a black Audi sedan bearing Missouri license plate MA7L5M arrive at the business and park next to **CS #5's** vehicle. TFO Taschner observed the unknown white male (later identified as **Michael SARACINO**) remain in the vehicle.

51.  At approximately 1:01 p.m., TFO Taschner observed **CS #5** exit the business and initiate contact with **SARACINO** near the trunk of **CS #5's** vehicle.  The following is a non-verbatim transcript of recorded meeting between **CS #5** and **SARACINO**.  **CS #5** stated, "Yo yo.  What's up buddy?"  **SARACINO** replied, "Hey what's up?"  **CS #5** inquired, "I'll just throw it there."  **SARACINO** responded, "Yeah."  **CS #5** stated, "I need to get back up, I have clients up there."  **SARACINO** asked, "What's that?"  **CS #5** stated, "I got clients upstairs, I have to run back up there."  **SARACINO** replied, "No problem, Alright buddy (inaudible)."  **CS #5** stated, "Yeah. Yeah."  **SARACINO** asked, "It's all in the box?"  **CS #5** confirmed, "Yeah." **SARACINO** stated, "Thanks bud."  During the conversation, when **SARACINO** asked, "It's all in the box?"  Your affiant believes **SARACINO** was asking **CS #5** if the marijuana and the money were in the boxes, which **CS #5** confirmed by stating, "Yeah."

52.  TFO Taschner observed **CS #5** retrieve the two cardboard boxes from his/her vehicle and the boxes were subsequently placed into the rear seat of the Audi sedan, utilized by **SARACINO**.  TFO Taschner observed **SARACINO** depart the business in the Audi sedan, as investigators followed.  St. Louis Metropolitan Police Officers conducted a traffic stop on the Audi sedan which led to the seizure of the approximate one (1) pound of marijuana.  Based on information from **CS #5, SARACINO** believed he was in possession of multi-pounds of marijuana and bulk U.S. currency.  **SARACINO** was arrested and conveyed to the South Patrol Precinct.

53.  Pursuant to the traffic stop and subsequent arrest of **SARACINO**.  Investigators met with **CS #5** at a prearranged location and interviewed **CS #5** relative to the interaction with **SARACINO**.  **CS #5** stated while he/she was in the business, **CS #5** received a telephone call **KIENSTRA** who advised that his buddy was waiting outside.  **CS #5** stated, at that time, he/she exited the business and initiated contact with the unknown male (**SARACINO**).  **CS #5** stated he/she did not know the subjects name but advised that the subject was the same individual who initially delivered the twenty (20) pounds of marijuana to **CS #5**.  At the time, of the controlled delivery to **SARACINO**, investigators were unaware of **target residence**.

### D. Controlled Delivery of 138 Pounds of Marijuana to Scott HENSLER and Ronald FREILICH on July 10, 2012.

54.  On July 9, 2012, DEA Task Force Group 33 was contacted by TFO Mitch Clark in reference to an interdiction of a large quantity of marijuana intercepted at an ABF Freight hub in Kansas City pursuant to a search warrant of a shipping container.  The container was sent by a

subject identified as Ronald FREILICH from Oakland, California, with a destination of St. Louis, Missouri. A search of the container resulted in a cover load consisting of a sofa, file cabinet and other household items. Within the cover load, investigators located an orange industrial toolbox and two large Pelican brand cases containing a total of 124 heat-sealed bundles wrapped in green cellophane containing marijuana. The total weight of the marijuana was approximately one hundred thirty eight (138) pounds. The shipping container was returned to the condition it was in prior to the execution of the search warrant but the marijuana was removed from all containers. The shipping container was scheduled to arrive in St. Louis on July 10, 2012.

55. On July 10, 2012, investigators initiated surveillance of the ABF Freight hub located in St. Louis, relative to the controlled delivery of the marijuana. At approximately 3:09 p.m., TFO Taschner observed a U-Haul truck pull onto the lot and TFO Taschner observed two males, later identified as Ronald FREILICH and **Scott HENSLER**, exit the vehicle and walk into the business. FREILICH subsequently parked the U-Haul truck next to the container and **HENSLER** and FREILICH removed everything from the container and loaded the items into the cargo area of the truck. TFO Taschner observed FREILICH and **HENSLER** enter the front cab of the truck and proceed to drive away.

56. At approximately 3:35 p.m., officers from the St. Louis Metropolitan Police Department conducted a traffic stop on the U-Haul for a traffic violation. A search of the truck revealed approximately twenty five (25) pounds of marijuana which was previously placed back into the pelican cases for the purpose of the controlled delivery. FREILICH and **HENSLER** were arrested by officers of the St. Louis Metropolitan Police Department and conveyed to the North Patrol station. Investigators met with FREILICH and **HENSLER** and both subjects were advised of their rights and FREILICH and **HENSLER** requested an attorney. At that time, both interviews were terminated.

57. As referenced above, investigators have received recent information from **CS #5** that **HENSLER** has delivered multi pounds of marijuana to **CS #5** and collected drug proceeds. This information, in conjunction with identifying that **HENSLER** resides with **KIENSTRA** and **AMANN** in addition to recent surveillance of the target subjects leads your affiant to believe that **HENSLER** is still involved in the distribution of marijuana and plays a significant role in the ongoing conspiracy.

**E. Seizure of \$94,980 from Miles AMANN on August 14, 2012 in San Francisco, California**

58. On August 14, 2012, TFO Holman received information from a Source of Information (**SOI**) revealing **AMANN** arrived at the ticket counter in St. Louis and paid cash for a one-way ticket to San Francisco, California via Southwest Airlines. TFO Holman contacted TFO Ronald Drake of the DEA San Francisco office and informed him of **AMANN's** arrival, as well as the ongoing investigation into **KIENSTRA** and his associates. TFO Drake initiated contact with **AMANN** at the San Francisco airport upon his arrival and **AMANN** consented to a search of his checked luggage which resulted in the seizure of \$94,980. During a consensual interview, **AMANN** stated he flew to California to "visit some friends" and could not confirm when he was going to return to Missouri. When asked, **AMANN** initially stated he has never been arrested. Investigators advised they had contradicting information to his statement then **AMANN** advised he was fighting a "possession of a controlled substance for sale" case. **AMANN** initially stated he had about \$20,000 then retracted his statement and advised that he had about \$90,000. **AMANN** stated he was a laborer and won the money gambling.

59. As described above, **AMANN** was untruthful about the origin of the U.S. currency and was not forthcoming with investigators. In addition, in August 2010, **AMANN** was arrested for distribution of cocaine in St. Louis and **AMANN** refused to make any statements or answer any questions. Based on confidential source information and the seizure of the U.S. currency, your affiant believes **AMANN** was transporting marijuana proceeds to San Francisco and **AMANN** has a significant role in the organization.

**F. Arrest of Michael SARACINO on May 23, 2013**

60. On October 23, ~~2013~~ 2012 ~~o.r.~~, **SARACINO** made five cash transactions at the River City Casino revealing that **SARACINO** exchanged cash and chips for various currency denominations. The Missouri Highway Patrol investigated the incident and **SARACINO** was in possession of \$26,870, which he told investigators were wages and tips he earned at a local restaurant. On May 14, 2013, a warrant was issued for **SARACINO's** arrest for one count of Money Laundering. On May 23, 2013, **SARACINO** turned himself in to authorities for the said charge. During this investigation, **CS #1** stated targets of this investigation frequented gambling casinos where they engaged in limited gambling and then obtained larger denominations of bills allowing the U.S. currency to be more easily concealed and transported to the marijuana source

of supply in California.

### G. Arrest of Miles AMANN on August 20, 2010 in St. Louis, Missouri

61. On August 16, 2010, investigators from the St. Louis County Police Department obtained information from a confidential source that **Miles AMANN** was selling cocaine from the residence located at 86 Forest Crest, Chesterfield, Missouri. The residence has been identified as **AMANN's** parent's residence. On this same date, the CS, along with an undercover officer, purchased $165 worth of cocaine from **AMANN**.

62. On August 20, 2010, as directed by investigators, the CS arranged to purchase five (5) ounces of cocaine from **AMANN** for $5,500. On this same date, the CS, along with an undercover officer met, with **AMANN** in front of the residence located at 86 Forest Crest. **AMANN** exited the residence carrying a black bag and **AMANN** opened the right rear door and leaned inside the vehicle, placing the bag on the floorboard of the vehicle. **AMANN** opened the black bag and showed the undercover officer two white envelopes. **AMANN** further added, "There are two envelopes, one envelope has three inside and the other has two." Upon conducting the cocaine transaction, **AMANN** was taken into custody without incident and was transported to the Ballwin Police Department. Investigators read **AMANN** his Miranda rights and **AMANN** stated he understood his rights and would not answer any questions or make any statements.

63. As outlined above, the primary target subjects of this investigation to include **AMANN, HENSLER** and **SARACINO** have all been arrested for drug violations and based on information from **CS #6** and a bulk U.S. currency seizure and bulk marijuana seizure occurring on September 24, 2013, referenced below, the target subjects have continued to engage in the distribution of hundred pound quantities of marijuana. In addition, although **KIENSTRA** has not yet been arrested, the information provided in this affidavit demonstrates that **KIENSTRA** is also currently involved in the distribution of hundred pound quantities of marijuana.

### VII. ADDITIONAL INFORMATION REGARDING THE TARGET SUBJECTS

### A. Information From The State of Missouri Probation Regarding Miles AMANN

64. As referenced above, investigators identified **AMANN** is currently on probation through the State of Missouri for possession of cocaine, as a result of his arrest in August 2010. On August 09, 2013, SA Moles contacted the Missouri Probation and Parole Office relative to **AMANN** and records revealed that **AMANN** has also documented that he currently resides at 86

Forest Crest Drive, Chesterfield, Missouri, which has been identified as **AMANN's** parents residence. However, surveillance, routine spot checks and court authorized GPS information for the subject cellular, utilized by **AMANN's** revealed **AMANN** has resided at **target residence** since the identification of the residence on March 04, 2013. In addition, investigators have identified the electric utilities are registered to **SARACINO**. Based on the fact that **AMANN** claimed that he resides at 86 Forest Crest Drive, Chesterfield, Missouri, your affiant believes **AMANN** is attempting to conceal where he resides due to his continued involvement in the distribution of marijuana. In addition, **AMANN** has advised Missouri Probation and Parole that he is employed as a "stage hand" and "rehabs" houses with his father. However, surveillance of **AMANN** has not resulted in observing **AMANN** engage in employment as a "stage hand" or "rehabbing" houses. SA Moles also received information from the Probation Officer that **AMANN** tested positive for cocaine on June 03, 2013.

## B. Authorization of Precision Location Information Warrants for KEINSTRA Telephone

65. On April 12, 2013, U.S. Magistrate Judge Shirley Mensah, Eastern District of Missouri, authorized a Precision Location Information warrant for (314) 378-9779 (KEINSTRA telephone), utilized by **KIENSTRA**. Investigators subsequently received authorization for two extensions of the Precision Location Information warrant.

66. On June 14, 2013, investigators conducted surveillance of **KIENSTRA** and Gary GARDNER at **target residence**. Investigators observed **KIENSTRA** and GARDNER take a taxicab from **target residence** to the Lambert St. Louis International Airport and investigators identified that **KIENSTRA** and GARDNER traveled to Las Vegas, Nevada, via Southwest Airlines. GPS information provided by KEINSTRA telephone, utilized by **KIENSTRA**, revealed **KIENSTRA** remained in the Las Vegas, Nevada, area until June 25, 2013. GPS information provided by KEINSTRA telephone indicated on June 25, 2013, **KIENSTRA** departed Las Vegas, Nevada, and traveled by vehicle to Mill Valley, California, which has been identified by CS #4 as the source area for the marijuana.

67. GPS information revealed **KIENSTRA** departed Mill Valley, California, on June 27, 2013, and traveled by vehicle to the Los Angeles area. On July 08, 2013, GPS information revealed **KIENSTRA** was at the Los Angeles International Airport (LAX) and subsequent GPS information revealed **KIENSTRA** traveled to Hawaii. On July 22, 2013, GPS information for

KEINSTRA telephone revealed **KIENSTRA** traveled from Hawaii to Los Angeles and **KIENSTRA** since remained in the Los Angeles area until the Precision Location Information warrant for KEINSTRA telephone terminated on August 15, 2013.

68.  This information is deemed valuable due to the fact that K**EINSTRA** is unemployed yet has the financial gains to travel to for an extended periods of time.  In addition, the GPS information revealed **KIENSTRA** was in the San Francisco, area where he obtains the marijuana. (See paragraph 78)

## VIII. TRASH RUNS

### A.  Trash Pull at SARACINO's Residence on September 03, 2013

69.  On September 03, 2013, investigators coordinated with Republic Services and conducted a trash pull at **SARACINO's** residence, located at 3543 Lost Meadow Court, St. Louis, Missouri.  Investigators obtained the trash from **SARACINO's** residence and the subsequent search of the trash resulted in the seizure of a Verizon Wireless prepaid cellular telephone package.  Based on training and experience, your affiant is aware that drug traffickers utilize several telephones, particularly prepaid cell phones to contact their criminal associates to orchestrate their drug trafficking activity.

### B.  Trash Pull at SARACINO's Residence on September 16, 2013

70.  On September 16, 2013, investigators coordinated with Republic Services to conduct a trash pull at **SARACINO's** residence, located at 3543 Lost Meadow Court, St. Louis, Missouri.  Investigators obtained the trash from **SARACINO's** residence and the subsequent search of the trash resulted in the seizure of two (2) Verizon Wireless prepaid cellular telephone packages and one Verizon Wireless $15 cellular telephone refill card.  Based on training and experience, your affiant is aware that drug traffickers utilize several telephones, particularly prepaid cell phones to contact their criminal associates to orchestrate their drug trafficking activity.

### C.  Trash Pull at Target residence on September 10, 2013

71.  On September 10, 2013, investigators coordinated with Republic Services and conducted  a trash pull at **target residence**.  A search of the trash resulted in the seizure of a broken Verizon Wireless Samsung prepaid cellular telephone, a Verizon Wireless prepaid cellular telephone package and one $30 Verizon Wireless refill card.  Based on training and experience, your affiant is aware that drug traffickers utilize several telephones, particularly

prepaid cell phones to contact their criminal associates to orchestrate their drug trafficking activity.

72.  SA Moles also seized one Coach Leatherware order receipt for an item purchased by **HENSLER** on August 15, 2013.  The receipt displays the purchase/shipping address of 1734 Clarkson Road, Suite 227, Chesterfield, Missouri.  On September 11, 2013, U.S. Postal Inspector Christopher Farmer advised SA Moles that on January 22, 2013, Laurie HENSLER, was granted a request to utilize Box 227 at the above referenced UPS Store to receive delivery of mail through the U.S. Postal Service.  Laurie HENSLER has previously been identified as the mother of **Scott HENSLER**.  The UPS Store located at 1734 Clarkson Road is approximately two blocks from **target residence**.  Based on training and experience, your affiant believes **Scott HENSLER** utilized his mother to obtain a mailing address at the UPS Store in an attempt to conceal that **HENSLER** currently resides at **target residence**.  In addition, investigators have identified that **HENSLER** drives a black Chevrolet Silverado truck bearing Missouri license plate 76AC22, which he routinely parks inside the garage of **target residence**.  A Department of Revenue check revealed Missouri license plate 76AC22 is registered to Laurie HENSLER. Based on training and experience, your affiant believes **HENSLER** directed his mother to register the vehicle in her name in another attempt to conceal that **HENSLER** resides as **target residence**.

### VX. FINANCIAL INFORMATION

### A. Grand Jury Subpoena Records for a Southwest Airlines Credit Card Utilized by Kyle KIENSTRA

73.  During this investigation, investigators identified that **KIENSTRA** utilizes a Southwest Airlines Visa credit card.  SA Moles subsequently issued a Grand Jury Subpoena and received credit card information.  SA Moles identified during the period of February 16, 2012 through June 19, 2013, **KIENSTRA** utilized the credit card to make total purchases of approximately $145,888.

74.  As referenced in paragraph 54 above, during the seizure and subsequent controlled delivery of approximately one hundred thirty eight (138) pounds of marijuana to **HENSLER** and FREILICH, investigators located the marijuana in an orange industrial toolbox and two large

Pelican brand cases.3  SA Moles identified on February 16, 2012, **KIENSTRA** purchased a Pelican style case from CPD Industries in Montclair, California. On February 15, 2012, an order was placed for two (2) Pelican brand cases for a total cost of $636.61. The billing name and address for the Visa card utilized for the purchase was documented as Deborah KIENSTRA, 10641 Rebecca Drive, St. Louis, Missouri 63128. Deborah KIENSTRA has previously been identified as the mother of **Kyle KIENSTRA**. The shipping name and address was documented as Ryan FAIRBROTHER, 346 Starling Road, Mill Valley, California 94941. The invoice listed a contact telephone number of (314) 398-9200, which has previously been identified as being utilized by **Kyle KIENSTRA**. In addition, **CS #4** identified FAIRBROTHER as a previous marijuana broker for **KIENSTRA** and his associates.

## B. Grand Jury Subpoena Records for an Eagle Bank Checking Account Utilized by Michael SARACINO

75. During this investigation, investigators identified that **SARACINO** has a checking account at Eagle Bank. SA Moles subsequently issued a Grand Jury Subpoena and received bank account information. Bank records revealed that from July 17, 2012 through June 19, 2013, **SARACINO** made payments totaling approximately $57,242.

76. SA Moles identified through the account information that **SARACINO** also made payments to CPD Industries in Montclair, California. SA Moles subsequently obtained records from CPD Industries via an Administrative Subpoena which revealed on March 20, 2012, **SARACINO** purchased three (3) Pelican brand cases. The shipping name and address was documented as Sarah HENSLEY, 1424 Lincoln Avenue, #B, San Rafael, California.

77. Between June 05, 2012 and June 15, 2012, **SARACINO** purchased fifteen (15) Pelican brand cases. The billing name and address for the purchase was documented as **Michael SARACINO**, 3543 Lost Meadow Court, St. Louis, Missouri 63129. The shipping name and address was documented as **Michael SARACINO**, 307 Sycamore, Mill Valley, California. The total purchasing amount of the eighteen (18) Pelican brand cases was $5,904.90. Based on this information in conjunction with the marijuana seized from the Pelican brand cases that the eighteen (18) Pelican brand cases purchased by **SARACINO** were utilized to conceal marijuana during the transportation.

---

3 Pelican brand cases are hard sided containers usually with padded interiors that are available in many different shapes and sizes.

### C. Employment

78. On September 25, 2013, TFO Wilson conducted an ACOM employment check for **KIENSTRA**, **AMANN**, **HENSLER** and **SARACINO**. As a result, the employment check revealed **AMANN** earned total wages of $6223.91, during the period of October 2012 through June 2013. The employment check revealed **SARACINO** earned total wages of $9,166.30, during the period of July 2012 through March 2013. The employment check revealed **KIENSTRA** and **HENSLER** do not have any data on file.

### X. SEIZURE OF MARIJUANA AND US CURRENCY ON SEPTEMBER 24, 2013

79. On September 23, 2013, investigator seized approximately $19,000 from a subject (hereinafter referred to as **CS #6**) following an automobile accident in Perryville, Missouri. The currency was located in the glove box of the vehicle. Following discovery of the currency, CS#6 confessed that the money was marijuana proceeds that he had recently picked up at the direction of KEINSTRA. On September 24, 2013, investigators again met with **CS #6** who wished to cooperate with investigators. **CS #6** advised he/she was directed by **KIENSTRA** to pick up the $19,000 in marijuana proceeds from a subject identified as Derek LUTZ. **CS #6** advised investigators that he/she had approximately sixty (60) pounds of marijuana concealed in a storage unit which he/she previously picked up, as directed by **KIENSTRA**. Investigators from the DEA Cape Girardeau Office contacted members of the DEA St. Louis Airport Task Force and arranged to meet at the location where the marijuana was being stored. Investigators subsequently recovered approximately eighty-seven (87) pounds of marijuana.

80. **CS #6** stated he/she was introduced to **SARACINO** in September or October of 2011. **CS #6** initially began selling multi-pounds of marijuana for **SARACINO**. **CS #6** stated upon **SARACINO** being arrested in March 2013, **SARACINO** asked **CS #6** if he/she wanted to work directly for **KIENSTRA**. In approximately March 2013, **CS #6** met with **KIENSTRA** and **SARACINO** at **SARACINO's** residence and **CS #6** agreed to be paid a salary of $1,500 per week for his role in the organization. However, **KIENSTRA** has not yet paid **CS #6** any money and **KIENSTRA** has advised **CS #6** that he is reinvesting the money owed to **CS #6** which **CS #6** agreed to. **CS #6** stated **KIENSTRA** obtains approximately two hundred fifty (250) pounds of marijuana approximately two times per month. **CS #6** stated when a shipment of marijuana arrives in St. Louis, **KIENSTRA** will contact **CS #6** and advise **CS #6** to obtain a U-Haul truck

and leave it at a parking lot. **CS #6** stated he/she returns the following day and picks up the U-Haul which then contains the bulk marijuana which is concealed in crates. **CS #6** stated he/she then transports the bulk marijuana to his/her residence and breaks the marijuana down and subsequently places the marijuana in storage unit for distribution. **CS #6** he/she is then contacted by **KIENSTRA** and is advised to relinquish the marijuana to specific individuals and pick up drug proceeds from the previous marijuana shipment. **CS #6** stated once he/she collects approximately $100,000 to $150,000, **KIENSTRA** directs **CS #6** to take the money to a hotel room and knock on the door. **CS #6** stated an unknown subject will open the hotel room door and **CS #6** will place the bag of money inside the room and will never make contact with the individual in the hotel room.

81. **CS #6** stated **AMANN**, **SARACINO**, **HENSLER** and **KIENSTRA** manage the flow of the marijuana but the subjects insulate themselves from the marijuana because they have all been previously arrested. **CS #6** stated **AMANN**, **SARACINO**, **HENSLER** and **KIENSTRA** each primarily have a main distributor who distributed the marijuana to lower level dealers.

82. On September 24, 2013, at approximately 7:48 p.m., **CS #6** attempted to contact **KIENSTRA** at telephone number (224) 301-7672 and **KIENSTRA** did not answer the telephone. At approximately 7:54 p.m., **CS #6** received an incoming call from **KIENSTRA** which was recorded by investigators. The following is a non-verbatim portion of the conversation between **KIENSTRA** and **CS #6**. During the conversation **CS #6** stated, "What's up sweetheart?" **KIENSTRA** replied, "What up, you call?" **CS #6** advised, "Yeah, I was thinking um, maybe doing the paperwork tonight so I didn't have to uh, do both tomorrow and all that running around so I don't have both at the same time." **KIENSTRA** stated, "Okay uh, let me call I'll call over right now. (Unintelligible) you can do, let me you can do, um, yeah, let me call right now alright?" **CS** advised, "Uh hmm. Bye."

83. At approximately 8:02 p.m., **CS #6** received another call from **KIENSTRA** which was recorded by investigators. The following is a non-verbatim portion of the conversation between **KIENSTRA** and **CS #6**. During the conversation, **KIENSTRA** stated, "Sup?" **CS #6** replied, "What's up baby?" **KIENSTRA** advised, "Uh, yeah, Arnold said you can come over there right now and get the paperwork." **CS #6** responded, "Is he uh, is he at his place?" **KIENSTRA** stated, "No, he's at the spot where he drops it off at." **CS #6** inquired, "Oh, is he at

his buddy's house?" **KIENSTRA** responded, "Yeah, movie boy." **CS #6**, advised, "He knows I'm not coming loaded right?" **KIENSTRA** stated, "He knows." **CS** stated, "Okay, cool. I'll be over in a little bit." **KIENSTRA** advised, "Alright, well how long you and then you can figure out a time and place for him tomorrow to be ready. Like when tomorrow." **CS** stated, "You want me to do Scooter (**Scott HENSLER**) all together tomorrow?" **KIENSTRA** replied, "Yeah just do Scoo, yeah that's." **CS #6** interrupted, "And do him last so I don't, and do him last so I don't have to drive with both." **KIENSTRA** conformed, "Exactly, yeah yeah." **CS #6** stated, "Thinking I wished we'd button down. Alright bro." **KIENSTRA** stated, "Alright."

84. **CS #6** identified "**Scooter**" as **Scott HENSLER** who resides at **target residence**. In the above mentioned call, **KIENSTRA** is directing **CS #6** to deliver marijuana and pick up marijuana proceeds to a subject who resides on Carondelet near Interstate 55. The subject is the primary marijuana distributor for **HENSLER**. **CS #6** stated he/she has delivered marijuana to the subject for **HENSLER** on approximately two occasions per month and **CS #6** usually collects approximately $30,000 each trip from the previous marijuana shipment. **CS #6** stated that **HENSLER** is usually present during the marijuana transaction to inspect the marijuana and **HENSLER** leaves the marijuana with the subject to distribute.

85. At approximately 8:30 p.m., investigators briefed for the impending controlled money pick up by **CS #6** from a subject identified only as "Arnold". At approximately 9:05 p.m., **CS #6**, driven by an undercover officer, departed a prearranged location and traveled to the residence located at 10619 Geanlee Drive, St. Louis, Missouri. Upon arrival, the undercover officer observed **CS #6** exit the undercover vehicle and enter the residence through the front door. At approximately 9:16 p.m., the undercover officer observed **CS #6** exit the residence carrying a red bag and **CS #6** entered the front passenger seat of the undercover vehicle. Investigators then followed the undercover officer and **CS #6** to a prearranged location. **CS #6** then relinquished the red bag containing bulk U.S. currency to SA Moles. **CS #6** stated that "**Arnold**" advised that there was $80,000.

86. At approximately 9:29 p.m., **CS #6**, placed a recorded telephone call to **KIENSTRA**. The following is a non-verbatim portion of the conversation between **KIENSTRA** and **CS #6**. During the conversation, **KIENSTRA** stated, "Sup?" **CS #6** responded, "It's all good. He turned in 80 hours." **KIENSTRA** replied, "Alright, did you double check it?"

CS #6 confirmed, "Yeah. It's good." KIENSTRA stated, "Alright, did you figure out a time and place for him tomorrow?" CS #6 advised, "He said he wants to do something around lunch." KIENSTRA stated, "Alright cool. Well uh, give me a call when you get home or whatever and I'll give you like an order for him or whatever (unintelligible) or we can do it in the morning I don't care, whatever you want." CS #6 stated, "Let's just do it in the morning bro, I'm exhausted, I just want to, I'm getting sick, I just want to go back to bed and try to get some fucking sleep and rest." KIENSTRA advised, "Alright buddy, thank you." CS #6 states, "Call me in the morning when you're ready for me to get going but you better be getting up early, hear?" KIENSTRA advised, "Alright bro."

87. On September 25, 2013, CS #6 placed a recorded telephone call to KIENSTRA regarding the delivery of approximately fifty (50) pounds of marijuana to "Arnold" as well as the delivery of approximately ten (10) pounds of marijuana to the subject who distributes marijuana for Scott HENSLER. CS #6 arranged to first pick up the "paper work", referring to U.S. currency from a previous marijuana transaction from HENSLER's distributor and then pick up and deliver the marijuana to HENSLER's distributor and to "Arnold". CS #6 stated HENSLER is usually present during the marijuana transaction so HENSLER can pick out the quality of the marijuana. CS #6 advised he would call KIENSTRA around dinner time to arrange to pick up the U.S. currency.

88. On September 25, 2013, investigators established surveillance of target residence. At approximately 1:50 p.m., TFO Jenne observed the overhead garage door open and HENSLER departed the residence in his black Chevrolet Silverado. TFO Jenne also observed KIENSTRA's Cadillac Escalade parked inside the garage. Investigators did not attempt to maintain surveillance of HENSLER to prevent the impending transactions from being compromised.

## XI. CONCLUSION

89. Based on the facts and circumstances above, your affiant believes KIENSTRA, AMANN and HENSLER have been involved in the distribution of marijuana since approximately 2010, and AMANN's previous arrest reveals he has also been involved in the distribution of cocaine. Investigators identified that KIENSTRA, AMANN and HENSLER have resided at target residence since January 02, 2013, when Missouri Ameren utilities were

placed in the name of **SARACINO**. As documented above, your affiant believes the utilities were placed in **SARACINO's** name in an effort to conceal from law enforcement where **KIENSTRA**, **AMANN** and **HENSLER** reside. In addition, investigators have identified that **SARACINO** plays a significant role in the marijuana distribution organization.

90. In addition, once investigators identified **target residence** was utilized by **KIENSTRA**, **AMANN** and **HENSLER**, investigators conducted routine spot checks and have attempted surveillance of the target subjects at **target residence**. Investigators have identified when **KIENSTRA** and **HENSLER** go to and from the residence, the overhead garage door is immediately closed. In addition, investigators have identified the target subjects drive in a pattern consistent with attempting to identify if they are being followed by law enforcement. In addition, as demonstrated above, **AMANN** has advised the Missouri Probation and Parole Office that he resides at 86 Forest Crest, Chesterfield, Missouri and **HENSLER** receives his mail at a UPS store approximately two blocks from **target residence**. Investigators identified that **KIENSTRA** departed St. Louis on June 14, 2013 and has not returned. However, as recent as September 24, 2013, investigators conducted surveillance of **target residence** prior to conducting a trash pull and investigators observed **HENSLER** back **KIENSTRA's** Cadillac Escalade out of the driveway to relocate the trash bins on the curb in front of the residence. Your affiant believes this demonstrates that **KIENSTRA** still maintains property at **target residence** and your affiant believes the authorization of a search warrant will glean additional evidence regarding all three target subjects who reside at the residence.

91. Based on information provided by **CS #1**, **CS #3**, **CS #4**, **CS #5** and **CS #6**, have all provided reliable information regarding **KIENSTRA**, **HENSLER** and **AMANN** are involved in the distribution of hundred pound quantities of marijuana. In light of the law enforcement events described **KIENSTRA**, **AMANN** and **HENSLER** have continued to distribute large quantities of marijuana.

The aforementioned facts support probable cause to believe that **Kyle KIENSTRA**, **Miles AMANN**, **Scott HENSLER**, **Michael SARACINO** have a significant roles in an ongoing, extensive marijuana distribution conspiracy which generates substantial amounts of money.

As part of my experience and training as a Special Agent with the DEA and that of other special agents and police officers on the investigating team, we have accumulated information and training in the areas of narcotics based economic crime. I have had extensive experience, as

have other members of the investigating team, in interviewing defendants, witnesses, informants and others who have experience in the gathering, spending, converting, transporting, distributing and concealing of proceeds of narcotics trafficking. Based upon my and the investigating team's experience and our participation in other pending and completed controlled substances and/or financial investigations involving ongoing, extensive cocaine distribution conspiracies involving large amounts of controlled substances and money, I know the following:

a.      It is common for large-scale dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in their residence or other buildings under their control.

b.      Drug traffickers frequently keep near at hand, in their residence or other buildings under their control, paraphernalia for packaging, cutting, weighing and distributing of drugs. These paraphernalia include, but are not limited to scales, plastic bags, and cutting agents.

c.      Drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, computer hard drives and disk records, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances. Drug traffickers commonly "front" (provide drugs on consignment) marijuana to their clients. The aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the drug traffickers have ready access to them, specifically in their residence or in other buildings under their control.

d.      Drug traffickers commonly maintain telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service; cellular and/or landline telephones; digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association in fact with  persons known to traffic in controlled substances or to facilitate such trafficking. These records are maintained where drug traffickers have ready access to them, specifically, in their residence or in other buildings under their control.

e.      Drug traffickers take or cause to be taken photographs of them, their associates, their property and their product. These traffickers frequently maintain these photographs in their residence or other buildings under their control.

f.      Persons involved in large-scale drug trafficking conceal in their residence or other buildings under their control large amounts of currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property utilized in the distribution of marijuana or which are proceeds from the distribution of marijuana.

g.      When drug traffickers amass large proceeds from the sale of drugs that the drug traffickers attempt to legitimize these profits. I know that to accomplish these goals, drug

traffickers utilize financial institutions, including but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts. They maintain record of these transactions in their residence or other buildings under their control.

       h.     Marijuana is not commonly manufactured within the United States, and the State of Missouri is not a major distribution point for drugs within the United States. It is common for drug traffickers to travel to major distribution centers, such as Los Angeles, California to purchase drugs and/or to arrange for its distribution elsewhere in the United States. After purchasing drugs, these drug traffickers will transport or cause to be transported, drugs to the areas in which they will distribute the drugs. The methods of transportation include, but are not limited to, commercial airlines, private airlines, rental automobiles, private automobiles, and government and contract mail carriers. Records of their travel are frequently kept in their residence or other buildings under their control.

       i.     Evidence of occupancy and residence including, but not limited to utility and telephone bills, canceled envelopes, rental or lease agreements, and keys, is relevant evidence in narcotics prosecutions.

       j.     Drug traffickers frequently possess firearms and/or other weapons in their residence or other buildings under their control to protect their marijuana and/or United States currency.

Based upon my analysis and review of the preceding information, I believe that probable cause exists indicating violations of Title 21, United States Code, Sections 846 and 841(a)(1).

Based upon the investigation by your affiant and other law enforcement officers, I believe that controlled substances, drug proceeds, and/or documents evidencing participation in drug trafficking will be found at the locations indicated above.

**"List"**

1.  Marijuana;

2.  Paraphernalia for packaging, cutting, weighing and distributing controlled substances, including, but not limited to, scales, baggies and spoons;

3.  Books, records, receipts, notes, ledgers, computer hard-drives and disk records, and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances and/or firearms;

4.  Telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service; cellular and/or landline telephones; digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association with persons known to traffic in controlled substances or to facilitate such trafficking.

5.  Photographs, in particular photographs of co-conspirators, of assets, and/or of controlled substances.

6.  United States Currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances;

7.  Books, records, receipts, pay stubs, employment records, bank statements and records, money drafts, letters of credit, money order and cashier's checks receipts, passbooks, bank checks and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money;

8.  Papers, tickets, notes, schedules, receipts and other items relating to travel, including, but not limited to, travel to and from St. Louis, Missouri and elsewhere;

9.  Indicia of occupancy, residency, rental and/or ownership of the vehicles and/or premises described above, including, but not limited to, utility and telephone bills, cancelled envelopes, rental or lease agreements and keys.